[Civ. No. 44311. First Dist., Div. One. June 18, 1980.]

OSCAR LEMER, Plaintiff and Appellant, v.
BOISE CASCADE, INC., et al., Defendants and Appellants.

COUNSEL

Ernest M. Thayer and Carroll, Burdick & McDonough for Plaintiff and Appellant.

Weyman I. Lundquist, Randall I. Barkan and Heller, Ehrman, White & McAuliffe for Defendants and Appellants.

OPINION

GRODIN, J.—Boise Cascade Corporation and one of its subsidiaries, Boise Cascade Recreation Communities Corporation of Delaware (hereinafter referred to jointly as Boise) appeal from a judgment based on a jury verdict against them and in favor of Oscar Lemer in the amount of $50,000 in compensatory damages and $250,000 in punitive damages for alleged fraud in connection with Lemer's purchase of four lots in Boise's recreational land development projects in Calaveras County, California. Lemer has filed a cross-appeal, claiming that he is entitled also to judgment against two other subsidiaries of Boise Cascade Corporation whom the trial court dismissed from the action, and that he is entitled to proceed to trial on his seventh cause of action,

which the trial court dismissed on statute of limitations grounds. We affirm, for the reasons which follow.

## I. Boise's Appeal.

Boise's argument consists of a double-barrelled attack on the punitive damage portion of the judgment. First, Boise contends that Lemer is totally barred from recovering punitive damages in this proceeding by reason of a settlement in a class action in which he was a representative plaintiff. Alternatively, Boise claims that the trial court erred in excluding certain evidence which it offered in mitigation of punitive damages, including evidence of that settlement. Understanding and analysis of both arguments require consideration of the procedural background to this litigation.

### A. *Procedural Background.*

This action, under the name Chiao et al. v. Boise Cascade Recreation Communities of Delaware et al., (hereafter *Chiao*) was originally brought as a class action in the Contra Costa County Superior Court by eight named plaintiffs, including Lemer, on behalf of those persons who had purchased property located at four of Boise's recreational subdivisions in Calaveras County, California. The complaint, seeking both compensatory and punitive damages and designating Richard N. Salle as attorney for the plaintiffs, was filed on October 12, 1971. That same day, the California Attorney General filed an action for civil penalties and exemplary damages against Boise on behalf of all persons who had purchased property in any of those same subdivisions or in Boise's recreational development at Incline Village, Nevada. Lemer had purchased four lots in the Calaveras County subdivisions and two lots at Incline Village. Five other actions were also filed against Boise, in the Superior Courts of Santa Clara, San Mateo, and San Francisco Counties, and in the United States District Courts for the Districts of Nevada and Northern California, alleging that members of a class or classes of persons had been induced by misrepresentations and unfair sales practices to purchase land from Boise in these same subdivisions and in seventeen other recreational developments.

On February 1, 1973, Boise, the State of California, and nine representative plaintiffs from the class actions described above (which nine plaintiffs included Chiao but not Lemer) entered into a forty-page "Agreement Respecting Settlement" of those seven actions. The nine

plaintiffs signed the agreement on behalf of themselves and all other members of their respective classes. The attorneys for the parties and for the class members also signed the document. Richard N. Salle signed as attorney for the class and for plaintiffs in *Chiao*, the case at bar.

The "Agreement Respecting Settlement" provided that the suit against Boise which was then pending in the United States District Court for the Northern District of California—denominated *McCubbrey et al.* v. *Boise Cascade, Inc., et al.*, (hereafter *McCubbrey*) civil action No. C-72-470-RFP—was the appropriate action in which to request court approval and administration of a settlement. The agreement then provided that one or more plaintiffs from each of the other class actions would "intervene as plaintiffs" in *McCubbrey*; that an amended complaint would be filed in *McCubbrey* to reflect a broadening of the plaintiff class; that the counsel of record in all of the class actions then pending against Boise would become counsel of record in *McCubbrey*; and that for purposes of the settlement, those plaintiffs who had intervened, plus at least one plaintiff from *McCubbrey* itself (as originally filed) would be "deemed" to represent the (expanded) class in *McCubbrey*. The agreement further provided that the parties would stipulate in the class actions other than *McCubbrey*, subject to approval of the respective courts, that the representative plaintiffs named in those actions should be deemed *not* to represent the classes as originally alleged therein, and that those actions should be stayed pending the federal court's approval or disapproval of the *McCubbrey* settlement.

The agreement contemplated that the federal court would enter a settlement order after certifying the expanded *McCubbrey* class and that the class action claims in the other pending actions would then be dismissed with prejudice. The agreement expressly provided, however, that "any individual private plaintiff in any of said actions who elects exclusion from the [*McCubbrey*] Class shall be entitled to pursue his individual claim in such pending action and such individual claims and actions shall not be dismissed." The agreement also provided that "nothing contained in this agreement shall be construed at any time or place to be an admission by Boise of any liability to any party or person" in any of the actions pending against it.

Following their execution of this agreement, the nine representative plaintiffs filed an amended complaint in *McCubbrey* wherein they (and

three of their wives) became the sole named plaintiffs in that action and the sole representatives of the *McCubbrey* class as then expanded, which class included every class member from each of the original seven actions. The federal court in *McCubbrey* then conditionally certified the expanded class for settlement purposes and ordered a fairness hearing, set for May 15, 1973, to consider all objections which any class members might have to the settlement proposed in the agreement of the named parties. Lemer received a notice of this hearing and of the proposed settlement terms but did not attend the hearing and voiced no objection. Richard N. Salle, the attorney who represented the eight original plaintiffs and the class in the case at bar—which remained pending in the Contra Costa County Superior Court—attended the fairness hearing as an attorney of record in *McCubbrey*. Both Boise and counsel for the *McCubbrey* plaintiffs, including Salle, represented to the federal court at the fairness hearing that Boise was in financial distress and that, if the case were not settled on the terms which were then being proposed, Boise would be thrown into bankruptcy by its creditors. Although various objections were raised to the proposed settlement, Salle supported it, as did the California Attorney General.

On May 21, 1973, Judge Peckham signed an order and final judgment in *McCubbrey* approving the proposed settlement as to "all persons who are present or former owners of property in all Boise Cascade recreational subdivisions...excepting only those class members who, on or before June 29, 1973, mail a written request to be excluded from the class...." Lemer mailed such a request on June 8, 1973, and thereby opted out of the *McCubbrey* settlement. He stated his reasons for doing so at his deposition: "If there were 40,000 land owners or purchasers, then all these people were to be included in the class action." Lemer believed that "there wouldn't be very much money to go around" when the settlement fund was applied in satisfaction of the claims of the *McCubbrey* class, and he guessed that the result would be "a very small return for these people."

On July 24, 1973, the parties in the case at bar stipulated through counsel, in accordance with the *McCubbrey* settlement order, that this action should be dismissed both as to the unnamed members of the class herein and as to all named plaintiffs except Lemer. On July 27, 1973, the trial court in this action approved that stipulation, dismissed with prejudice all claims asserted on behalf of the class, and dismissed this action as to all plaintiffs and other class members except Lemer.

B. *The Alleged Settlement Bar.*

█ Boise argues generally that the class action settlement should bar subsequent recovery of punitive damages by a member of the class, because the punitive and deterrent functions of such damages have already been served, and a subsequent recovery of punitive damages amounts to a form of "civil double jeopardy." The problems posed by multiple punitive damage suits have troubled both courts (e.g., *Roginsky* v. *Richardson-Merrell, Inc.* (2d Cir. 1967) 378 F.2d 832, 838-841) and commentators (e.g., Schulkin, *Mass Liability and Punitive Damages Overkill* (1979) 30 Hastings L.J. 1797), and various legislative remedies have been proposed (*ibid.*); but the argument made here, that a court should apply the doctrine of double jeopardy to such a situation, "has been rejected by every court that has heard it, for good reason; double jeopardy applies only to two criminal prosecutions by the sovereign. Neither a completed criminal action, nor the potentiality of criminal prosecution, will bar receipt of punitive damages. By the same reasoning, the granting of punitive damages to one plaintiff will not bar the later granting of punitive damages to another plaintiff for the same act of the defendant." (*Id.*, at p. 1805.) Boise cites no authority in support of its position, and our research has disclosed none. Moreover, even if the rule for which Boise contends were appropriate for judicial adoption, which we doubt, it would have no application to these facts. The class action did not lead to a judgment for punitive damages. Moreover, as discussed later, the settlement figure was a small fraction of the compensatory damages claimed, and no part of the settlement was expressly allocated to a punitive award.

Boise also argues more specifically, and this is the main thrust of its first line of attack, that in any event *Lemer* should be barred from seeking punitive damages because to do so conflicts with his fiduciary duty to the class. This argument proceeds from established premises that "[w]hen a plaintiff sues on behalf of a class, he assumes a fiduciary obligation to the members of the class, surrendering any right to compromise the group action in return for an individual gain" (*La Sala* v. *American Sav. & Loan Assn.* (1971) 5 Cal.3d 864, 871 [97 Cal.Rptr. 849, 489 P.2d 1113]), and that a "'fiduciary will not be permitted to profit through a breach of his duty as fiduciary'" (*Crowder* v. *Lyle* (1964) 225 Cal.App.2d 439, 449 [37 Cal.Rptr. 343], quoting from 4 Scott on Trusts (2d ed. 1956) § 499, p. 3224) "'although the profit received by the fiduciary is not at the expense of the beneficiary....'"

(*Bank of America* v. *Ryan* (1962) 207 Cal.App.2d 698, 706, quoting from Rest., Restitution (perm. ed.) § 197, p. 809, com. c.) It follows from these authorities, Boise argues, that a representative plaintiff may not give his approval to the terms of a settlement of the claims of the class he represents, only to opt out and seek on his own behalf "a windfall award of punitive damages."

We agree that for a class representative to opt out of a settlement and pursue damages independently may raise serious questions of fiduciary obligation, as where he urges the class to settle without revealing his own negative assessment of the settlement or his intention to opt out after the settlement is approved. We assume arguendo that if the breach of fiduciary obligation is clear perhaps the defendant ought to be able to assert the breach as a defense to the subsequent proceeding on the theory that a court should not lend itself to an obvious impropriety (cf. *Goldstein* v. *Lees* (1975) 46 Cal.App.3d 614, 623, fn. 10 [120 Cal.Rptr. 253]). We cannot say, however, that on this record Lemer violated his fiduciary duty as a matter of law. To begin with, Lemer was but one of eight named plaintiffs in the original *Chiao* action, and the only one to opt out. The settlement agreement in the *McCubbrey* action provided that after the filing of the amended complaint in that action, "the purported Class representatives in the remainder of the actions in paragraph A-1 [which included the *Chiao* action] shall be deemed not to represent the Class as alleged therein." *Chiao*, as a named plaintiff, became a class representative in the *McCubbrey* action and his attorney (who had been the attorney in *Chiao*) represented to the court that the agreement was fair, partly on the basis of his opinion that Boise was in financial distress.

There is nothing to indicate, and certainly Boise does not contend, that the settlement was in fact unfair to the members of the class, and it does not appear necessarily inconsistent for a class representative to believe that a settlement is in the best interests of the class and at the same time to be willing to undertake additional risk in the hope of obtaining a better outcome for himself. The settlement agreement which Boise signed and which the court in *McCubbrey* approved expressly provides that "*any* individual private plaintiff in *any* of [the underlying class] actions who elects exclusion from the [*McCubbrey*] class shall be entitled to pursue his individual claim in such pending action..." (italics added), and at the *McCubbrey* "fairness hearing" Boise's counsel, when asked, "What is the position of the people who opt [out] and elect

to present independent claims later on the company," replied, "These claims will be treated like any individual lawsuit." If the members of the class formerly represented by Lemer believe that he violated his fiduciary obligation to them by pursuing individual relief, they presumably have a remedy in the *McCubbrey* action which, the court is advised, is still within the jurisdiction of the federal district court. We are aware of no authority, and no principle of equity, that would permit Boise to bar Lemer's recovery in this proceeding on the facts presented.

### C. *The Alleged Errors in Excluding Evidence of Boise's Conduct.*

Boise offered at trial evidence of the *McCubbrey* settlement and of a rescission offer to Lemer in mitigation of its alleged fraudulent activity. The trial court rejected both offers, and Boise contends that both rulings were erroneous.

### 1. Evidence of the *McCubbrey* Settlement.

Boise argues that evidence of the *McCubbrey* settlement would have been relevant (a) to prove that the punitive and deterrent functions of exemplary damages already had been satisfied by the settlement, and (b) to demonstrate Boise's good faith with respect to the settled claim. Boise submits further that it was greatly prejudiced by the exclusion because Lemer was permitted, for a limited purpose, to introduce evidence of land transactions between Boise and third parties,[1] and Lemer's counsel in closing argument to the jury summarized this evidence and referred to Boise's "wholesale fraud."

Initially, in ruling upon a motion by Lemer to exclude such evidence *in limine,* the trial court relied upon Evidence Code section 1154, which renders settlements or offers of settlement inadmissible "to prove the invalidity of the claim or any part of it." Boise contends, correctly, that this provision has no application where the evidence is not tendered as an admission of weakness by the party who settled or offered to settle, but for some other purpose. (See McCormick on Evidence (2d ed. 1972) § 274, p. 664.) During the course of trial, however, Boise made a renewed offer to prove the *McCubbrey* settlement, and this time

---

[1]The court accepted evidence of several land transactions between Boise and third parties as evidence of a course of conduct on the part of Boise, to show that certain representations alleged in the complaint had, in fact, been made to Lemer, and to show that Boise must have known of the misconduct of its agents. Boise does not challenge the validity of these rulings.

the trial court explained its ruling on different grounds: "Had I opened the door on that, we would have been here the next 90 days—nine months." We view this comment as reflecting an exercise of the court's discretion, under Evidence Code section 352, to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." And if that ruling was correct, it should be upheld on appeal regardless of the reasons articulated by the trial court for its order *in limine*. (*Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 328-329 [48 P. 117].)

Boise cites no authority for the admissibility of the evidence which it offered. Even if it were clear that the *McCubbrey* settlement included an explicit punitive damage component, the relevance of that to Lemer's recovery is problematic.[2] But in fact the *McCubbrey* settlement does not contain such a component,[3] and the amount of the settlement is but 17 cents on the dollar claimed as *compensatory* damages in the various actions which were consolidated in *McCubbrey*. Thus, it would be impossible on the basis of evidence of the settlement alone for the jury to arrive at any sensible view of the extent to which the settlement rendered a *punitive* damage award redundant, or of the extent to which it reflected "good faith" on the part of Boise with respect to the persons alleged to have been damaged by its fraudulent acts. And it was well within the discretion of the trial court to conclude that whatever marginal value the jury might derive from knowledge of the settlement amplified by its total context was more than outweighed by the heavy costs in trial time and expense the amplification would undoubtedly require. If Boise were to attempt to demonstrate that the settlement reflected good faith and performed punitive functions, for example,

---

[2]On the problems inherent in instructing a jury that it should consider prior or potential punitive damage awards, see *Roginsky* v. *Richardson-Merrell, Inc., supra,* 378 F.2d 832, 840; Schulkin, *Mass Liability and Punitive Damages Overkill, supra,* 30 Hastings L.J. 1797, 1806-1808; cf. Mallor & Roberts, *Punitive Damages: Toward a Principled Approach* (1980) 31 Hastings L.J. 639, 669.

[3]Boise referred in its offer of proof to deposition testimony of the deputy attorney general in charge of the state's litigation against Boise, who assertedly stated: "The facet of punitive damages in the lawsuit was negotiated in my view and part of the payment...represented a compromise of the plaintiffs' claims for punitive damages." This statement, apparently constituting the deputy's opinion as to the dynamics of the settlement negotiations, but totally lacking in foundation and specificity, would not have been admissible in evidence and therefore cannot serve as an offer to establish relevant facts. The settlement called for payment of certain amounts to the state, but as reimbursement for expenses and costs of suit, not as punitive damages.

Lemer would undoubtedly wish to demonstrate the opposite. As to Boise's claim of prejudice from reference to other transactions, the trial court properly instructed the jury that it was to consider such evidence only as it pertained to Lemer's relationships with Boise; the reference to "wholesale fraud" by Lemer's attorney in his concluding argument to the jury, as to which Boise's attorney raised no objection at the time, was ambiguous and could have referred to the many misrepresentations and concealments to which Lemer himself was allegedly subjected. We conclude that exclusion of the offered evidence was not error.

### 2. The Rescission Offer.

Boise offered to prove a series of written communications with Lemer in 1971, wherein Lemer had complained of his purchases and Boise offered him rescission. This evidence was relevant, Boise argues, to the question whether it ratified the fraud of its employees (*Coats v. Construction & Gen. Laborers Local No. 185* (1971) 15 Cal.App.3d 908, 914 [93 Cal.Rptr. 639]). Boise argues it should have been permitted to prove "that it responded to Lemer's first expression of discontent with an offer to refund every cent he had paid Boise for his lots." The offer of rescission stated, however, that it was being made because of the failure of a public report to indicate to purchasers that a county service area had been created, and this was not an omission of which Lemer had ever complained. On this ground the trial court granted Lemer's motion *in limine* to exclude the proffered evidence, but advised Boise that if it could produce evidence that it first became aware of the alleged misrepresentations of its agents at the time of the alleged rescission offer, and that it made the offer in response to Lemer's charges of misconduct, the court would change its ruling. On the ninth day of trial, Boise renewed its argument concerning the rescission offer, and the court made the same observation. This time, in response, Boise's counsel stated that it would the next day produce its employee, Nancy Bookholder, who would testify that Lemer had made his complaints to her and that the rescission offer was made as a result. The trial court warned Boise that the witness would have to be produced before the proffered correspondence would be received in evidence. The witness never materialized.

Although settlement offers are not admissible to prove liability (Evid. Code, § 1152), they may be admitted in evidence to show good faith. (*Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d

285, 297 [85 Cal.Rptr. 444, 466 P.2d 996].) Thus, the rescission offer was relevant to the issue of Boise's liability for punitive damages insofar as the offer may have been made in response to Lemer's complaints.

However, where the relevance of proffered evidence depends upon the existence of a preliminary fact, the proponent of the evidence has the burden of proving the existence of that preliminary fact before the evidence will be admitted. (Evid. Code, § 403.)

Here the rescission offer stated on its face that it was made because of a failure of a public report—without reference to any complaints Lemer had made about the transactions. Accordingly, the trial court—absent a showing that the offer was made in response to Lemer's charges of misrepresentation—correctly deemed the evidence of rescission irrelevant to the issue of Boise's good faith. Boise had the burden of proving that preliminary fact, and the ability to do so. Since it did not meet that burden, the evidence was properly excluded.

## II. LEMER'S CROSS-APPEAL.

Lemer as cross-appellant argues that he was entitled to judgment as a matter of law against Boise Cascade Home and Land Corporation and Boise Cascade Credit Corporation, notwithstanding the jury's verdict in favor of those two corporations, both Boise subsidiaries. He contends that the two subsidiaries engaged in a "common scheme" and should be viewed as "alter egos" of the parent corporation, and alternatively that they are guilty of authorizing and ratifying Boise's fraud. Both theories present questions of fact as to which the jury was properly instructed, and the jury's implied findings on these theories contrary to Lemer's contentions are amply supported by the evidence. (E.g., *T W M Homes, Inc.* v. *Atherwood Realty & Inv. Co.* (1963) 214 Cal. App.2d 826, 852 [29 Cal.Rptr. 887].)

Lemer argues also that the trial court erred in sustaining a general demurrer to his seventh cause of action, added by amendment in 1975 and based upon claims arising out of his purchases of property located at Incline Village, Nevada in 1969. The trial court ruled that these claims were barred by the three-year statute of limitations. (Code Civ. Proc., § 338, subd. 4.) Whether the court was correct, or whether as

Lemer contends it is the four-year statute (Code Civ. Proc., § 337, subd. 3) that applies, the claims were time-barred by 1975.

The judgment is affirmed. Each party to bear its costs on appeal.

Racanelli, P. J., and Newsom, J., concurred.

Petitions for a rehearing were denied July 21, 1980. Newsom, J., was of the opinion that the petition of Boise Cascade, Inc., should be granted. The petitions of all parties for a hearing by the Supreme Court were denied August 13, 1980. Manuel, J., did not participate therein.